PRESENT: All the Justices

CHERYL H. WOOD, ET AL.

v. Record No. 190738

TRACEY L. MARTIN

OPINION BY
JUSTICE D. ARTHUR KELSEY
OCTOBER 22, 2020

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Richard E. Gardiner, Judge

During a divorce proceeding in 2010, John Wood agreed to maintain a preexisting life insurance policy for the partial benefit of his soon-to-be ex-wife, Tracey L. Martin. The circuit court ratified the agreement and incorporated it into the final divorce decree. Six years after the final divorce decree, in defiance of that court order, Wood removed Martin as a beneficiary and designated his new wife, his brothers, and a friend as new beneficiaries on the policy. Two days later, Wood committed suicide. After the insurer interpleaded the policy proceeds in a suit initiated by Martin, the circuit court awarded Martin her agreed-upon share of the proceeds consistent with the earlier divorce decree. Claiming that the court erred by doing so, the new beneficiaries appeal. We disagree and affirm.

I.

In 2004, during the marriage of Martin and Wood, American General Life Insurance Company ("AGLIC") issued a $1.5 million term life insurance policy to Wood. In 2008, Wood assigned that policy to Access National Bank in order to secure a loan, and AGLIC confirmed that assignment. Wood and Martin separated in 2010 and entered into a Separation and Property Settlement Agreement that was later amended by an Addendum and Modification Agreement (collectively, the "PSA"). The couple filed for divorce, and the circuit court's final divorce decree ratified, affirmed, and incorporated the PSA.

The PSA required Wood to maintain Martin "as 50% beneficiary in the unencumbered amount of $750,000" on the $1.5 million life insurance policy or a comparable policy as long as Wood "has a spousal support obligation, and/or until the youngest child graduates from a 4-year college or reaches her 23rd birthday, whichever last occurs." J.A. at 138. The PSA further provided that "[i]n the event either of the parties dies and has not complied with the required terms as set forth" in the life insurance provision, "the insurance death benefits as set forth above shall become a charge against the decedent's estate in favor of the other party." *Id.* at 139.

In 2014, the circuit court found Wood in contempt for willfully defaulting on his obligations imposed by the final divorce decree. *See id.* at 61 n.1. On June 9, 2017, the court entered another order stating that "Wood remains in willful contempt of this court's orders" and directed that he be "released from incarceration" only upon payment of his "various obligations and arrearages" imposed by the court's final divorce decree and later enforcement orders. *Id.* at 61-62; *see also id.* at 89. In a handwritten note at the bottom of the June 9, 2017 contempt order, the court ordered Wood to provide Martin with information regarding the AGLIC life insurance policy, including the named beneficiaries and the percentage of the proceeds allotted to each. *See id.* at 63. Shortly thereafter, as of June 15, 2017, Martin was listed as a 50% primary beneficiary of the life insurance policy. *See id.* at 89.

Approximately three months later, Wood executed a change-of-beneficiary designation that named (i) his new wife, Cheryl H. Wood, as a 45% primary beneficiary; (ii) his brother, Thomas M. Wood, as a 40% primary beneficiary; (iii) his brother, Timothy M. Wood, as a 5% primary beneficiary; and (iv) his friend, Mark W. Klopfenstein, as a 10% primary beneficiary (collectively, the "new beneficiaries"). *See id.* at 176. In a handwritten note signed with his initials at the bottom of the change-of-beneficiary designation, Wood stated: "The omission of my ex-wife, Tracey Martin, is intentional." *Id.* (altering capitalization). Two days later, Wood

2

committed suicide. At the time of his death, Wood remained obligated under the PSA to maintain Martin as a 50% primary beneficiary of the AGLIC life insurance policy.

After Martin attempted to submit a claim against the policy and discovered that Wood had removed her as a beneficiary, Martin filed suit in January 2018 against the new beneficiaries, AGLIC, Access National Bank, Wood's estate, and unnamed trustees of Wood's living trust. Martin's four-count complaint requested injunctive relief and a declaratory judgment confirming her entitlement to 50% of the life insurance proceeds against all defendants, alleged unjust enrichment against the new beneficiaries, and asserted a breach of contract claim against Wood's estate and living trust. A consent order required AGLIC to deposit $750,000 (representing Martin's disputed 50% share) with the court, to pay $74,062.50 to Access National Bank to satisfy Wood's assignment, and to distribute the remainder of the life insurance proceeds to the new beneficiaries. *See id.* at 66. Upon AGLIC's payments, the circuit court dismissed both AGLIC and Access National Bank as defendants and dismissed Martin's claim for injunctive relief. Martin also nonsuited her breach of contract claim against Wood's estate and living trust and withdrew her unjust enrichment claim against the new beneficiaries. With only Martin's claim against the interpleaded funds remaining, Martin and the new beneficiaries filed cross-motions for summary judgment. In a joint stipulation of facts, the parties agreed that the only issue left in the case was the contest over "the remaining Life Insurance Policy's proceeds, or $750,000, plus accrued interest thereon, as interpleaded with the [c]ourt." *Id.* at 90.

Martin argued that she alone was entitled to the interpleaded $750,000 of life insurance proceeds because the PSA and the final divorce decree had bound Wood to maintain Martin as a 50% beneficiary. *Id.* at 184-85. Wood's change-of-beneficiary designation, Martin argued, could not divest her of this right. In response, the new beneficiaries argued that Martin's claim was barred by Code § 38.2-3122(B), which protects insurance items from creditor claims, and

3

that the PSA had stipulated that her exclusive remedy was a breach of contract claim against Wood's estate, a claim that Martin had nonsuited. *See* J.A. at 200-05. The circuit court disagreed with both arguments and awarded the interpleaded insurance proceeds to Martin.

## II.

On appeal, the new beneficiaries assert three assignments of error that collectively make two points. First, they argue that Code § 38.2-3122(B) bars any claim that Martin may have because she is a "creditor" seeking to obtain the insurance proceeds by "other legal process." Second, they contend that Martin's equitable claim to the proceeds is precluded because the PSA stipulates that her sole remedy is a breach of contract action against Wood's estate. We disagree with both assertions.[1]

## A.

The dispute in this case is not uncommon.[2] Its procedural posture, however, is unique. Prior to the circuit court's entry of summary judgment, the parties had stipulated that the only remaining issue was the contest over the $750,000 in life insurance proceeds — the res "interpleaded with the Court." J.A. at 90. The court's final judgment limited itself to this issue by awarding Martin the "insurance proceeds and accrued interest . . . as previously interpleaded

---

[1] We review de novo "the application of law to undisputed facts." *St. Joe Co. v. Norfolk Redev. & Hous. Auth.*, 283 Va. 403, 407 (2012). While our legal analysis differs from the circuit court's, we may affirm the judgment on different grounds than those relied upon by the circuit court. *See Rickman v. Commonwealth*, 294 Va. 531, 542 (2017) (stating that the reviewing court may affirm the judgment of the lower court by applying the "right-result-*different*-reason doctrine" while "express[ing] no view on the correctness of the lower court's rationale" (emphasis in original)).

[2] *See generally* Diane M. Arnold, *Cause of Action To Recover Proceeds of Life Insurance Policy Based on Insured's Violation of Divorce Decree Entitling Plaintiff to Life Insurance Benefits*, 22 Causes of Action 463 (2020); Kelvin H. Dickinson, *Divorce and Life Insurance: Post Mortem Remedies for Breach of a Duty To Maintain a Policy for a Designated Beneficiary*, 61 Mo. L. Rev. 533 (1996).

with the Court and being held by the clerk of the Court," *id.* at 286. Given this context, Martin's claim to the interpleaded res is an equitable one. *See Day v. MCC Acquisition, LC*, ___ Va. ___, ___, Record No. 190603, slip op. at 13-14 (Oct. 15, 2020) (distinguishing an in personam judgment from an in rem judgment that determines "competing ownership claims against the res" and "operates directly on the property itself" (citations omitted)).

The equitable nature of Martin's claim answers the new beneficiaries' first argument that Code § 38.2-3122(B) bars Martin from asserting it. In relevant part, the statute protects certain "insurance item[s]," such as life insurance proceeds, from being "liable to execution, attachment, garnishment, or other legal process in favor of any creditor" of the insured. Code § 38.2-3122(B). Subsection C of the statute, however, clarifies that this protection "shall not apply to any claim by a creditor with respect to a life insurance policy . . . that was . . . *assigned in writing* for the benefit of the creditor." Code § 38.2-3122(C) (emphasis added). A related statute clarifies this point:

> Since the purpose of §§ 38.2-3122 and 38.2-3122.1 is to confer additional rights, privileges, and benefits upon beneficiaries and assignees of policies, no beneficiary or assignee shall by reason of these sections be divested or deprived of or prohibited from exercising or enjoying any right, privilege, or benefit that he would have or could exercise or enjoy had §§ 38.2-3122 and 38.2-3122.1 not been enacted.

Code § 38.2-3125. This clarification confirms that prior *substantive* law governing underlying rights and liabilities still governs any "right, privilege, or benefit" that "assignees" have under existing law, *id.*

In this case, we need not determine whether Martin qualifies as a "creditor" or, even if she were one, whether her in rem claim constitutes "other legal process" subject to Code § 38.2-3122. Under existing law, Martin's claim is based upon an equitable assignment that arose by

5

operation of law when the circuit court ratified the PSA's life insurance provision and entered a final divorce decree incorporating the PSA and ordering Wood to comply with it.[3]

1.

An equitable assignment is "[a]n assignment that, although not legally valid, will be recognized and enforced in equity — for example, an assignment of a chose in action." Black's Law Dictionary 148 (11th ed. 2019). Both chancery and common-law courts have applied the doctrine of equitable assignment broadly to include "an assignment or transfer of the fund or some definite portion of it, so that the person owing the debt or holding the fund on which the order is drawn can safely pay the order, and is compellable to do so, though forbidden by the drawer." *Virginia Mach. & Well Co. v. Hungerford Coal Co.*, 182 Va. 550, 556 (1944) (citation omitted); *see also Rinehart & Dennis Co. v. McArthur*, 123 Va. 556, 570 (1918) (stating that an equitable assignment "is sufficient if the debtor would be protected in making payment thereon").

A valid equitable assignment "vests an equitable ownership" in the "personal property to be acquired at a future time" when the equitable assignor acquires the property, "and this ownership a court of equity will protect and maintain at the suit of the equitable assignee." *Braxton v. Bell*, 92 Va. 229, 236 (1895). "No particular form of words is necessary to constitute a valid assignment in equity of a chose in action," such as the right to life insurance proceeds in

---

[3] In considering the definition of an "assignment" under Code § 38.2-3122(C), we interpret this statutory term (unless the text clearly states otherwise) in a manner consistent with the preexisting common law on assignments. *See Tvardek v. Powhatan Vill. Homeowners Ass'n*, 291 Va. 269, 276 n.4 (2016) ("A statute touching on matters of common law must 'be read along with the provisions of the common law, and the latter will be read into the statute unless it clearly appears from express language or by necessary implication that the purpose of the statute was to change the common law.'" (citation omitted)). We apply the same principle when a statutory term borrows from the lexicon of the chancery courts. *See Day*, ___ Va. at ___, slip op. at 5.

the present case, and "[t]he intention of the assignor is the controlling consideration," *Rinehart &*
*Dennis Co.*, 123 Va. at 570. "If the owner of a chose in action, for a valuable consideration,
signs and delivers a writing whereby he intends . . . to apply the proceeds to a specific purpose
other than for the use and benefit of the assignor, it is a valid equitable assignment, regardless of
the particular language used." *Id.*

We applied the principle of equitable assignment in *Upton v. Ames & Webb, Inc.* to an
agreement by a husband to not prosecute his cross-bill for divorce on the ground of desertion if
the wife agreed to endorse over a life insurance policy that she held on the husband's life. *See*
179 Va. 219, 223-24 (1942). In an analogous context, we also held that an assignment of a life
insurance policy "is in effect a change of beneficiary pro tanto" and that the assignee has a
superior right to the assigned portion of life insurance proceeds over the claim of a designated
beneficiary. *Smith v. Coleman*, 184 Va. 259, 268 (1945); *see* 4 George J. Couch et al., Couch
Cyclopedia of Insurance Law § 27:64, at 694 (2d ed. rev. 1984) ("Normally it is said that the
beneficiary's rights vest upon the death of the insured. This position may not be valid where
someone other than the beneficiary has an equitable or legal right to be treated as the beneficiary
of the policy.").

The equitable-assignment doctrine applies to a property settlement agreement ratified and
enforced by a final divorce decree. In this context, the Restatement of Contracts has correctly
described the former spouse's right to the life insurance proceeds as "an equitable assignment"
based upon the rationale that "a contract to assign or a contract to transfer proceeds may create a
right in the promisee very similar to that of an assignee," which "can be enforced against third
parties." Restatement (Second) of Contracts § 330 cmt. c & illus. 6 (1981). That same rationale
was applied in *Equitable Life Assurance Society of the United States v. Jones*, a case in which a
husband was obligated under a separation agreement incorporated into a final divorce decree to

maintain his former wife as the primary beneficiary of a life insurance policy. *See* 679 F.2d 356, 358 (4th Cir. 1982). The husband violated the decree by naming his second wife as the primary beneficiary, and after he died, both wives claimed the interpleaded insurance proceeds. *See id.* The Fourth Circuit held that the former wife had "an equitable interest in the proceeds" and was entitled to the proceeds unless the second wife could "establish a superior equity by credible proof that she gave good consideration, without knowledge of [the former wife's] designation and the provisions of the separation agreement and the decree of divorce, for her designation as beneficiary." *Id.* at 359 (remanding for factual findings on the issue of consideration); *see Lincoln Nat'l Life Ins. v. Johnson*, 38 F. Supp. 2d 440, 451 (E.D. Va. 1999) (holding that a husband had "bargained away his property right to control the beneficiary designation" by entering into a separation agreement with his wife that was incorporated into the final divorce decree). With minor doctrinal differences, a strong consensus among courts[4] and legal scholars[5] has developed recognizing the role of these traditional equitable principles in this unique context.

Applying these principles to the present case, we hold that Code § 38.2-3122(B) does not bar Martin's claim to the life insurance proceeds. In doing so, and as noted previously, we need not answer whether Martin is a "creditor" or whether her in rem claim constitutes "other legal

---

[4] *See, e.g.*, *Travelers Ins. v. Daniels*, 667 F.2d 572, 573-74, 576 (7th Cir. 1981); *Murphy v. Travelers Ins.*, 534 F.2d 1155, 1158, 1161-62 (5th Cir. 1976); *Principal Mut. Life Ins. v. Karney*, 5 F. Supp. 2d 720, 731 (E.D. Mo. 1998); *Travelers Ins. v. Johnson*, 579 F. Supp. 1457, 1460-61 (D.N.J. 1984); *Perkins v. Prudential Ins. Co. of Am.*, 455 F. Supp. 499, 501 (S.D. W. Va. 1978); *Western Life Ins. v. Bower*, 153 F. Supp. 25, 28-29 (D. Mont. 1957); *Dubois v. Smith*, 599 A.2d 493, 497 (N.H. 1991); *Herrington v. Boatright*, 633 S.W.2d 781, 783 (Tenn. Ct. App. 1982); *Box v. Southern Farm Bureau Life Ins.*, 526 S.W.2d 787, 789 (Tex. Civ. App. 1975); *Travelers Ins. v. Lewis*, 531 P.2d 484, 485-86 (Utah 1975).

[5] *See generally* 29 John Alan Appleman & Eric Mills Holmes, Appleman on Insurance 2d § 180.11[B][1], at 523 (2006); 4 Couch et al., *supra*, § 27:65, at 694, 696; 4 Steven Plitt et al., Couch on Insurance 3d § 64:24, at 64-74 to -77, 64-76 n.3 (2011 rev. ed.); *id.* § 64:25, at 64-79 to -82; Arnold, *supra* note 2, § 2.

process" subject to Code § 38.2-3122(B). It is dispositive that Martin's claim arises out of the equitable assignment created by the PSA that was incorporated in and enforced by the final divorce decree. By its own terms, the statutory bar does not apply to claims "with respect to a life insurance policy . . . that was . . . assigned in writing" to the claimant. Code § 38.2-3122(C).

2.

Because Code § 38.2-3122(B) does not bar Martin's claim, we must address the circuit court's holding that Martin's equitable claim to the proceeds was superior to that of the new beneficiaries. The new beneficiaries' interests arose for the first time two days before Wood's death. No evidence suggests that the designation of the new beneficiaries was the product of a bilateral agreement supported by consideration. Nor did the new beneficiaries pursue any of the available defenses to a claimed equitable assignment in the circuit court.[6] These facts and the great weight of authority previously mentioned, *see supra* pp. 7-8 and notes 4-5, support the circuit court's holding that Martin's claim should take precedence over the interests asserted by the new beneficiaries.

---

[6] Like every other equitable claim, Martin's assertion of an equitable assignment of her beneficial interest in the proceeds was potentially subject to a battery of possible defenses — such as laches, unclean hands, equitable estoppel, undue influence, and unconscionability. *See* 2 Charles E. Friend & Kent Sinclair, Friend's Virginia Pleading and Practice § 36.04, at 36-17 to -22 (3d ed. 2017) (stating that "[i]n most instances, any valid defense to the merits of a case may be asserted in a suit in equity" and that "the very nature of equity itself may provide defenses that would not be available in an action at law," such as laches, unclean hands, and equitable estoppel); Kent Sinclair, Sinclair on Virginia Remedies § 43-1, at 43-2 (5th ed. 2016) (listing the primary defenses to equitable relief as including "laches, unclean hands, in pari delicto, estoppel, impossibility, unconscionability, unreasonableness of the transaction, hardship, mistake, duress, undue influence, and undue hardship on the courts"); Arnold, *supra* note 2, § 6 (observing that a "defendant may rely on general equitable principles to attack the plaintiff's ability to bring an action to recover the proceeds of a life insurance policy," such as laches, equitable estoppel, or unclean hands). While the new beneficiaries pleaded the affirmative defense of unclean hands in their responsive pleading and briefed the issue, *see* R. at 104; J.A. at 219, they did not mention unclean hands at the hearing for summary judgment. The trial court did not rule on the defense, and the new beneficiaries did not object to the absence of such a ruling or raise the issue on appeal.

To us, the doctrinal gestalt of this case is simple but ambiguous: "Equity regards that as done which ought to have been done," *Federal Rsrv. Bank of Richmond v. Peters*, 139 Va. 45, 57 (1924). Applied here, that statement means that "[w]here the insured is obligated by judicial decree to change the beneficiary under his policy, the law will regard him as having done that which he is obligated to do and will treat the policies as equitably assigned to the persons who should have been named as beneficiaries," 17 Couch et al., *supra*, § 63A:162, at 98 (2d ed. rev. 1983); *see also* 3 Plitt et al., *supra* note 5, § 37:35, at 37-35. We also find relevant the maxim that "where there are equal equities the first in order of time shall prevail" unless the later-in-time claimant is "a bona fide holder for value of the legal title, without notice" of the equitable assignment, *Braxton*, 92 Va. at 236; *see also* 3 Plitt et al., *supra* note 5, § 37:18, at 37-22.

We are unpersuaded by the new beneficiaries' contention that Martin "lacks an actual assignment" because such an assignment "would require Access National Bank's endorsement and AGLIC's recordation." Reply Br. at 9-10. This assertion confuses Martin's rights with the insurer's rights. "[I]t has been held that a written assignment constitutes an enforceable equitable assignment as between the insured and his or her assignee even though no notice was given to the insurer and the assignee did not take possession of the policy or have the assignment endorsed on the policy." 3 Plitt et al., *supra* note 5, § 37:31, at 37-31 to -32.

The failure to notify AGLIC of the assignment in the divorce decree may have prevented Martin from holding AGLIC liable for paying any proceeds to the new beneficiaries. But it did not prevent Martin from asserting her superior equitable right to her share of the life insurance proceeds over the claims of the new beneficiaries. *See Fidelity & Deposit Co. of Md. v. Moore*, 177 Va. 341, 347 (1941) ("Provisions of an insurance policy requiring written notice of an assignment or a change of beneficiary to be given to the insurer are for the benefit of the insurer."). "Provisions with respect to formalities of assignment are for the benefit of the insurer

10

and it alone can complain of noncompliance." 17 Couch et al., *supra*, § 63:92, at 792 (2d ed. rev. 1983); *see also* 3 Plitt et al., *supra* note 5, § 37:31, at 37-32 (stating that enforcing equitable assignments lacking the requisite formalities "protect[s] the rights of the assignee against the insured" but not "the assignee's rights against the insurer who has paid the proceeds to a third party").[7]

We thus come to the same conclusion as the circuit court — that Martin had a superior equitable claim to her share of the life insurance proceeds. By operation of law, she received an equitable assignment under the final divorce decree, which ratified, affirmed, and incorporated the PSA requiring Wood to maintain her as a 50% beneficiary on the life insurance policy.

B.

Finally, the new beneficiaries argue that the PSA precludes Martin's equitable claim to the proceeds because the PSA stipulates that the "exclusive remedy" available to her is "a contract claim against Wood's estate." Appellants' Br. at 6. The circuit court correctly rejected this argument.

The PSA provides that "[i]n the event either of the parties dies and has not complied" with the life insurance provisions, "the insurance death benefits as set forth above shall become a charge against the decedent's estate in favor of the other party." J.A. at 139.[8] This provision

---

[7] The fact that Wood had agreed only to maintain Martin as a 50% beneficiary on the life insurance policy as long as he had a spousal support obligation or until their youngest child graduated from college or turned 23 has no impact on the equitable assignment because none of those subsequent conditions had occurred at the time of Wood's death. An equitable assignment may have a subsequent condition that "has power to divest the equitable title to the gift, yet if that condition does not arise, the title, by relation, is regarded as complete and absolute from the time of the gift." *Russell's Ex'rs v. Passmore*, 127 Va. 475, 499 (1920).

[8] A charge against an estate is a "claim for a debt" or a "claim against the estate" presented to a commissioner of accounts who then recommends to the circuit court whether to enforce or to reject it. *See generally* Code §§ 64.2-552 to -553; 2 Frank O. Brown, Jr., Virginia Practice Series: Probate Handbook § 13:2, at 176 (2019-2020 ed.) (noting that a commissioner of

11

does not say that the life insurance proceeds "shall *only* become" a debt of the estate or that all other possible remedies are contractually waived. Instead, the provision merely assures Martin that any contractual claim that she may have against Wood will survive his death.[9] This type of provision only signifies that the contractual obligations survive the death of one of the contracting parties, which is a standard clause in many, if not most, contractual instruments used in a host of transactions.

Under Virginia law, a contractual remedy will be deemed exclusive "only where the language employed in the contract *clearly* shows an intent that the remedy be exclusive." *Bender-Miller Co. v. Thomwood Farms, Inc.*, 211 Va. 585, 588 (1971) (emphasis added); *cf.* Sinclair, *supra* note 6, § 2-1[C], at 2-4 (observing that claims for consequential damages may be contractually waived if such a limitation is expressed in "sufficiently clear language in the agreement" and that "other limitations on available remedies" should similarly be upheld if "clearly specified" (citing *Landmark HHH, LLC v. Park*, 277 Va. 50, 57 (2009))).

The survival provision of the PSA does not clearly specify that a "charge against [Wood's] estate" is Martin's only remedy in the event of his death. *See* J.A. 139. Nothing in the provision states, for example, that in exchange for having a "charge against [Wood's] estate," *id.*, Martin agrees to waive any other in personam claims that she might have against other parties, such as the insurer or the new beneficiaries. All the more, the provision does not purport to preclude an in rem claim against an interpleaded res. Properly read, therefore, the provision

---

accounts ascertains "debts and demands against the estate" so that the holder of an obligation guaranteed or endorsed by the decedent may not "make a claim against the estate long after the decedent's death").

[9] *See generally* Dickinson, *supra* note 2, at 545-46 (explaining the historical background that prompted the use of such clauses in property settlement agreements in divorce cases).

functions only as a survival clause confirming that Martin, in the event of Wood's death, can assert against the estate whatever breach of contract claim that she might have had against Wood.

III.

In sum, the circuit court did not err in awarding Martin her 50% share of Wood's life insurance proceeds that were interpleaded into the court. Code § 38.2-3122(B) does not bar Martin's claim because the final divorce decree that ratified and incorporated the PSA created an equitable assignment. Faced with competing equities, the court found Martin's beneficial interest in the interpleaded proceeds to be superior to that of the new beneficiaries. Finding no error in the court's judgment, we affirm.

*Affirmed.*